**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**Case No.**

CCS MUSIC GROUP, LLC,

Plaintiff,

v.

H BRAND LLC and DEREK JACKSON,

Defendants.

## VERIFIED COMPLAINT

Plaintiff, CCS Music Group, LLC ("**CCS Music**"), files this Complaint against Defendants, H Brand LLC ("**H Brand**") and Derek Jackson (collectively, "**Defendants**"), and states:

### Nature of the Action

1. This is an action for fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, and promissory estoppel against Defendants. CCS Music's claims arise out of Defendants' misrepresentations of material fact to CCS Music concerning Defendants' ability to fund the recording, marketing and distribution of, and their ability to market and distribute successfully, an album featuring the Grammy-nominated recording artist Mario Dewar Barrett produced by the well-known producer Scott Storch, the recording of which was solely funded by CCS Music.

### The Parties, Jurisdiction And Venue

2. Plaintiff, CCS Music Group, LLC, is a limited liability company organized and existing under the laws of the State of Florida, with its principal place of business located at 1002 E. Newport Center Dr., 200, Deerfield Beach, FL 33442.

3. Upon information and belief, Defendant Derek Jackson is an individual domiciled in New Jersey.

4. Upon information and belief, Defendant H Brand LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in New York, NY.

5. Upon information and belief, H Brand is primarily owned and operated by Derek Jackson.

6. Pursuant to 28 U.S.C. § 1332(a)(1), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

7. Pursuant to Fla. Stat. § 48.193(1)(b) and the due process requirements of the federal constitution, this Court has personal jurisdiction over Defendants because a substantial aspect of Defendants' acts of wrongdoing alleged herein took place in Florida and were purposefully directed to Plaintiff and because the alleged claims arise out of and/or relate to those acts of wrongdoing.

8. Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this District because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in Broward County, Florida.

## General Allegations

9. CCS Music is a business formed in March, 2015, and run primarily by Seth Cohen and Brad Cohen, brothers from Ft. Lauderdale, Florida. CCS Music is in the business of, among other things, producing and recording music.

10. Scott Storch ("Storch") is a well-known American record producer.

11. Storch is a member of CCS Music Group, LLC.

12. In the early 2000's, Storch was considered one of the top producers in the music industry. Storch has worked with several well-known recording artists, such as Beyoncé, 2-Pac, 50 Cent, Christina Aguilera, Dr. Dre and Jessica Simpson.

13. Mario Dewar Barrett p/k/a Mario ("**Mario**") is a well-known, Grammy-nominated, American singer-songwriter, recording artist and actor.

14. In or around February, 2015, CCS Music, Storch and Mario began planning to record and produce a few master recordings - to be produced by Storch, featuring Mario as the recording artist. At this time, CCS Music, Storch and Mario did not intend to produce an entire album featuring Mario.

15. Shortly after CCS Music, Storch and Mario began planning to record a few master recordings featuring Mario, CCS Music began discussions with Derek Jackson regarding a potential business relationship between CCS Music and H Brand concerning the funding, recording, marketing and distribution of an entire album to be produced by Storch featuring Mario as the recording artist (the "**Mario Album**").

16. In considering whether to move forward with recording the yet-to-be produced Mario Album, Seth Cohen and Brad Cohen stated to H Brand that CCS Music was concerned about the amount of funds that would be necessary to record, market and distribute the Mario Album successfully.

17. At that time, Derek Jackson, on behalf of himself and H Brand, claimed to have $500,000 to contribute towards the recording, marketing and distribution of the Mario Album. Derek Jackson also claimed, on behalf of himself and H Brand, to have extensive experience in the music industry and stated that he and H Brand were more than capable of marketing and distributing the Mario Album successfully.

18. In reliance on Derek Jackson's representations that he and his company had $500,000 to contribute towards the recording, marketing and distribution of the Mario Album and that he and his company were capable of marketing and distributing the Mario Album successfully, CCS Music began recording and funding the recording of the Mario Album.

19. In reliance on Derek Jackson's representations that he and his company had $500,000 towards the recording, marketing and distribution of the Mario Album and that he and his company were capable of marketing and distributing the Mario Album successfully, in May of 2015, CCS Music entered into two agreements with H Brand: a Letter of Intent Re: Mario (the "**Mario Agreement**") and a Letter of Intent Re: Scott Storch (the "**Storch Agreement**"), wherein CCS Music agreed to fund the recording of the Mario Album in exchange for a share in sales profits which H Brand agreed to distribute (the Mario Agreement and the Storch Agreement collectively, the "**Mario Album Agreements**").

20. The Mario Album Agreements also purported to transfer certain rights to the Mario Album to H Brand.

21. On June 14, 2015, H Brand purportedly entered into an amended agreement with non-party Caroline Records, a division of UMG Recordings (the "**Caroline Amendment**"), wherein H Brand granted Caroline Records exclusive distribution rights with regard to the Mario Album. The Caroline Amendment purportedly supplemented a 2014 agreement (the "**Caroline Distribution Agreement**") between Caroline Records and H Brand setting forth additional terms regarding the parties' distribution deal.

22. The Caroline Distribution Agreement provided that H Brand was solely responsible for paying all costs associated with the manufacturing and marketing of records

covered by the agreement and that any such costs paid up-front by Caroline Records would be considered advances to be charged against record sales.

23. The Caroline Distribution Agreement also provided that if adjusted net receipts of record sales were insufficient to cover manufacturing costs associated with the records manufactured under the agreement, H Brand was responsible for paying those costs out-of-pocket within 45 days of Caroline Record's written demand for payment.

24. CCS Music completed the recording of the Mario Album in approximately July, 2015. At that time, the Mario Album was fully edited and mixed, and otherwise in such form suitable for the manufacture, marketing and distribution of commercial records.

25. CCS Music spent approximately $400,000 in recording costs in recording the Mario Album, including, but not limited to, studio time, advances paid to Storch and Mario, and engineering fees.

26. Neither H Brand nor Derek Jackson contributed funds toward the recording of the Mario Album.

27. In or around July, 2015, CCS Music's managing members Seth Cohen and Brad Cohen began having doubts about whether both H brand and Derek Jackson had sufficient funds and capability to successfully market and distribute the Mario Album.

28. In late summer/early Fall, Caroline Records informed CCS Music that H Brand had no funds to market or distribute the Mario Album.

29. Counsel for CCS Music has been informed by H Brand's counsel that there is no longer a distribution deal between H Brand and Caroline Records concerning the Mario Album.

30. Upon information and belief, neither H Brand nor Derek Jackson have contributed funds toward the marketing and/or distribution of the Mario Album.

31. The Mario Album has not been distributed.

32. On September 17, 2015, after CCS Music voiced concerns to Derek Jackson regarding his and H Brand's ability to fund, market and distribute the Mario Album successfully, H Brand's counsel sent an e-mail to Brad Cohen and Seth Cohen asserting ownership rights in the master recordings embodying the Mario Album, offering to terminate the Mario Album Agreements, and transfer the rights in the masters to CCS Music and Mario's management company, in exchange for $350,000.

33. Despite CCS Music entering into the Mario Album Agreements and spending approximately $400,000 in recording costs, and despite H Brand's failure to fund any of the recording, marketing or distribution of the Mario Album, H Brand continues to assert ownership rights in and to the Mario Album against CCS Music.

**COUNT I – FRAUDULENT INDUCEMENT**
(against both Defendants)

34. CCS Music realleges as if set forth herein paragraphs 1 through 33.

35. Defendants made false statements of material fact to CCS Music to induce CCS Music to record the Mario Album, to fund the recording of the Mario Album, and to enter into the Mario Album Agreements which purported to grant to H Brand certain ownership rights in the master recordings embodying Mario's performances and other rights to profits from sales of the Mario Album.

36. For instance, in approximately February, 2015, Defendants falsely represented that they possessed the funds needed to market and distribute the Mario Album when in fact neither Derek Jackson nor H Brand had such funds.

37. As another instance, in approximately February, 2015, Defendants falsely represented that they had $500,000 to contribute toward the recording, marketing and

distribution of the Mario Album, when in fact neither Derek Jackson nor H Brand had such funds.

38. As another instance, in approximately February, 2015, Defendants falsely represented that they were capable of marketing and distributing the Mario Album successfully, when in fact neither Derek Jackson nor H Brand had such capability.

39. These prior representations by Derek Jackson and H Brand and its agents, including but not limited to Derek Jackson, were knowingly and intentionally false when made.

40. Defendants knowingly made these false statements of material fact with the intent to induce reliance thereon by CCS Music.

41. Defendants acted in concert when they made, or caused to be made, these material misrepresentations to induce CCS Music to rely on them.

42. CCS Music justifiably relied upon the material misrepresentations by H brand and Derek Jackson, and in such reliance, entered into the Mario Album Agreements.

43. In so relying upon the material misrepresentations made by H Brand and Derek Jackson, CCS Music recorded and Mario Album and spent approximately $400,000 in funding the recording of the Mario Album.

44. CCS Music would not have recorded the Mario Album, would not have spent $400,000 in recording the Mario Album and would not have entered into the Mario Album Agreements had it known the aforesaid representations were false.

45. CCS Music has been damaged as a direct and proximate result of Defendants' actions.

*Wherefore*, CCS Music respectfully requests this Court enter judgment against Defendants, jointly and severally, for all damages, attorneys' fees, costs, and interest, and such other relief as this Court deems just.

**COUNT II – FRAUDULENT MISREPRESENTATION**
(against both Defendants)

46. CCS Music realleges as if set forth herein paragraphs 1 through 33.

47. Defendants intentionally and knowingly made, or caused to be made, false and fraudulent statements of material fact to CCS Music to induce CCS Music to record the Mario Album, to fund the recording of the Mario Album and to enter into the Mario Album Agreements which purported to grant to H Brand certain ownership rights in the master recordings embodying Mario's performances and other rights to profits from sales of the Mario Album.

48. For instance, in approximately February, 2015, Defendants falsely represented that they possessed the funds needed to market and distribute the Mario Album when in fact neither Derek Jackson nor H Brand had such funds.

49. As another instance, in approximately February, 2015, Defendants falsely represented that they had $500,000 to contribute toward the recording, marketing and distribution of the Mario Album, when in fact neither Derek Jackson nor H Brand had such funds.

50. As another instance, in approximately February, 2015, Defendants falsely represented that they were capable of marketing and distributing the Mario Album successfully, when in fact neither Derek Jackson nor H Brand had such capability.

51. These prior representations made by Derek Jackson and H Brand and its agents, including but not limited to Derek Jackson, were knowingly and intentionally false when made.

52. Defendants knowingly made these false statements of material fact with the intent to induce reliance thereon by CCS Music.

53. Defendants acted in concert when they made, or caused to be made, these material misrepresentations to induce CCS Music to rely on them.

54. CCS Music justifiably relied upon the material misrepresentations by H Brand and Derek Jackson.

55. In so relying upon the material misrepresentations by H Brand and Derek Jackson, CCS Music recorded the Mario Album, spent approximately $400,000 in funding the recording of the Mario Album and entered into the Mario Album Agreements.

56. CCS Music would not have recorded the Mario Album, would not have spent approximately $400,000 in recording the Mario Album and would not have entered into the Mario Album Agreements had it known the aforesaid representations were false.

57. CCS Music has been damaged as a direct and proximate result of Defendants' actions.

*Wherefore*, CCS Music respectfully requests this Court enter judgment against Defendants, jointly and severally, for all damages, attorneys' fees, costs, and interest, and such other relief as this Court deems just.

**<u>COUNT III – NEGLIGENT MISREPRESENTATION</u>**
(against both Defendants)

58. CCS Music realleges as if set forth herein paragraphs 1 through 33.

59. Defendants made false statements of material fact to CCS Music to induce CCS Music to record the Mario Album, to fund the recording of the Mario Album and to enter into the Mario Album Agreements which purported to grant to H Brand certain ownership rights in the

master recordings embodying Mario's performances and other rights to profits from sales of the Mario Album.

60. For instance, in approximately February, 2015, Defendants falsely represented that they possessed the funds needed to market and distribute the Mario Album when in fact neither Derek Jackson nor H Brand had such funds.

61. As another instance, in approximately February, 2015, Defendants falsely represented that they had $500,000 to contribute toward the recording, marketing and distribution of the Mario Album, when in fact neither Derek Jackson nor H Brand had such funds.

62. As another instance, in approximately February, 2015, Defendants falsely represented that they were capable of marketing and distributing the Mario Album successfully, when in fact neither Derek Jackson nor H Brand had such capability.

63. Each of these prior misrepresentations by Defendants concerned facts material to CCS Music.

64. Defendants made each of these misrepresentations of material fact without ascertaining the truth or falsity of each representation and/or knew or should have known each representation was false when made to CCS Music.

65. Defendants intended to induce, and/or knew or should have known that each of their misrepresentations would induce, CCS Music to record the Mario Album, fund the recording of the Mario Album and enter into the Mario Album Agreements.

66. Defendants acted in concert when they made, or caused to be made, these material misrepresentations.

67. CCS Music justifiably relied upon the material misrepresentations by H Brand and Derek Jackson, and in such reliance, recorded the Mario Album, funded the recording of the Mario Album and entered into the Mario Album Agreements.

68. CCS Music would not have recorded the Mario Album, would not have spent approximately $400,000 in recording the Mario Album and would not have entered into the Mario Album Agreements had it known the aforesaid representations were false.

69. CCS Music has been damaged as a direct and proximate result of Defendants' actions.

*Wherefore*, CCS Music respectfully requests this Court enter judgment against Defendants, jointly and severally, for all damages, attorneys' fees, costs, and interest, and such other relief as this Court deems just.

**COUNT IV – PROMISSORY ESTOPPEL**
(against both Defendants)

70. CCS Music realleges as if set forth herein paragraphs 1 through 33.

71. Prior to, subsequent to, and outside of the execution of the Mario Album Agreements, Defendants represented to CCS Music that Defendants possessed the funds needed to market and distribute the Mario Album and that H Brand was capable of marketing and distributing the Mario Album successfully.

72. Prior to, subsequent to, and outside of the execution of the Mario Album Agreements, Defendants represented to CCS Music that they had $500,000 to contribute to the recording, marketing and distribution of the Mario Album.

73. It was reasonably foreseeable that Plaintiff, in recording the Mario Album, in funding the recording of the Mario Album and in entering into the Mario Album Agreements,

which purported to grant to H Brand certain ownership rights to the Mario Album, acted in good faith reliance on Defendants' representations.

74. Plaintiff relied in good faith on Defendants' representations.

75. CCS Music's reliance upon Defendants' promises caused harm to CCS Music.

76. Injustice can only be avoided if Defendants' promises are enforced because, absent such enforcement, Defendants will be permitted to retain the benefits of the purported grant to H Brand of certain ownership rights in the master recordings embodying Mario's performances and other rights to profits from sales of the Mario Album without having to pay for same.

*Wherefore*, CCS Music respectfully requests this Court enter judgment against Defendants, jointly and severally, for all damages, attorneys' fees, costs, and interest, and such other relief as this Court deems just.

**JURY TRIAL DEMAND**

CCS Music demands a trial by jury on all issues triable as such.

Dated: January 12, 2016.

Respectfully submitted,
Akerman LLP

*/s/ Jonathan S. Robbins*

Jonathan S. Robbins, Esq.
Fla. Bar No. 989428
Primary E-mail: jonathan.robbins@akerman.com
Secondary E-mail: nancy.alessi@akerman.com
Ashley A. Sawyer, Esq.
Fla. Bar No. 0012131
Primary E-mail: ashley.sawyer@akerman.com
Secondary E-mail: jill.parnes@akerman.com
350 East Las Olas Blvd., Suite 1600
For Lauderdale, FL 33301
Phone: (954) 463-2700
Fax: (954) 463-2224

*Counsel for CCS Music Group, LLC*

# VERIFICATION

STATE OF FLORIDA
COUNTY OF BROWARD

Before me, the undersigned authority, duly authorized to administer oaths and take acknowledgments, personally appeared SETH COHEN who, after being first duly sworn, deposes and says that he is a managing member of the Plaintiff, CCS Music Group, LLC and that in such capacity he has authority to make this verification on behalf of Plaintiff; that the affiant has read the foregoing Verified Complaint and states that the facts and matters alleged and contained therein are true and correct; and that the affiant has made this affidavit upon his own personal knowledge of the facts involved as alleged in the Verified Complaint.

____________________________
SETH COHEN

STATE OF FLORIDA )
) ss:
COUNTY OF BROWARD )

The foregoing instrument was sworn to and subscribed before me this 11th day of JANUARY, 2016, by SETH COHEN, as a managing member of CCS Music Group, LLC. He is personally known to me or has produced ________________ (type of identification) as identification. SR

____________________________
Notary Public – State of Florida

____________________________
(Print, Type or Stamp Commissioned Name of Notary Public)

STUART REBEN
Notary Public - State of Florida
My Comm. Expires Nov 15, 2018
Commission # FF 142926
Bonded Through National Notary Assn.